```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5 3 11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

YASHUA PLAIR,

                         Plaintiff,                    10 Civ. 8177

     -against-                                         OPINION

CITY OF NEW YORK; Commissioner DORA B.
SCHIRRO; Chief of Department LARRY W.
DAVIS, SR.; Deputy Commissioner FLORENCE
FINKLE; Supervising Warden of Division II
ARTHUR OLIVARI; Warden EMMANUEL
BAILEY; Officer PEREZ; JOHN DOES # 1-20,

                         Defendants.

------------------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          HARVIS & SALEEM LLP
          305 Broadway, 14th Floor
          New York, NY  10007
          By:  Gabriel P. Harvis, Esq.


          Attorneys for Defendants

          MICHAEL A. CARDOZO
          Corporation Counsel of the
            City of New York
          100 Church Street, Room 3-159
          New York, NY  10007
          By:  Steve Stavridis, Esq.

1

**Sweet, D.J.**

Defendants City of New York (the "City"), Dora B. Schirro ("Commissioner Schirro"), Larry W. Davis, Sr. ("Chief Davis"), Florence Finkle ("Deputy Commissioner Finkle") Arthur Olivari ("Warden Olivari") and Emmanuel Bailey ("Warden Bailey") (collectively, the "Supervisory Defendants") have moved to dismiss the complaint of plaintiff Yashua Plair (the "Plaintiff" or "Plair") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion is denied in part and granted in part as set forth below.

## Prior Proceedings

Plair filed his complaint against the City, the Supervisory Defendants, Officer Perez, and John Does # 1-20, on October 28, 2010.  It alleges the following events.

On September 8, 2010, at approximately 8:30 p.m., Plair, a pre-trial detainee at the Robert N. Davoren Center adolescent jail on Rikers Island ("RNDC"), had a verbal

2

disagreement with another inmate in his housing area.  Complt.
¶¶ 27-28.  Officer Perez sounded an alarm and a team consisting
of approximately 8 armed DOC officers and 2 captains arrived,
handcuffed Plair, and brought him to a hallway.  Complt. ¶¶ 29-
33.  The officers surrounded Plair and, when he objected to a
false account by Officer Perez of the events preceding the
alarm, an unidentified captain punched Plair three times,
resulting in fractures to both sides of his jaw and excruciating
pain.  Complt. ¶¶ 34-40.  After informing his assailants that
his jaw was broken, Plair was taken to a cell in RNDC's intake
area and locked inside; his pleas for pain relievers and medical
care, made both as he was placed in the cell and continuously
for the next nineteen hours, were ignored.  Complt. ¶¶ 41-46.
During those nineteen hours, Plair specifically asked eight or
more unidentified DOC staff in the intake area for medical
treatment.  Complt. ¶ 46.

At approximately 3:30 p.m. on the following day, Plair
was taken to the Rikers Island onsite clinic, where he was
administered Tylenol and x-rayed.  Complt. ¶ 47.  He was then
transported to the Bellevue Hospital Prison Ward in a DOC bus.
Complt. ¶ 48.  After undergoing surgery and spending six days at

the hospital, Plair was returned to Rikers Island and held at

the NIC infirmary jail for ten days before being released.

Complt. ¶¶ 51-52.  As a result of the assault, DOC detained

Plair for at least eight days beyond his scheduled release date.

Complt. ¶ 52.


      Plair has submitted, in addition by affidavit, the

following:


(1)    In the first 10 months of 2008, 39 inmates at
RNDC suffered serious facial injuries—broken
noses, broken jaws, or fractured eye sockets,
records show.  Twenty-eight of those inmates were
teenagers.  From October 2007 to October 2008,
DOC's Chief of Department and Chief of Facilities
Operations were receiving, but failing to act
upon, regular reports concerning gang violence
and extortion—some of it encouraged by correction
officers at RNDC.  Despite repeated mention at
weekly staff meetings of a "disturbing trend" of
violence at RNDC during that period, then-Chief
of Facilities Operations Patrick Walsh "treated
each incident as isolated and failed to act on
the overall problem."  A senior DOC official
described the strategy enacted to combat violence
at RNDC as a "Band-Aid approach" and stated that
DOC leadership would "deal with the incident, but
not see the big picture:  that it was widespread
throughout [RNDC]."  Senior DOC officials "needed
to break that culture and make this kind of thing
unacceptable, but no one put it together.  It's
all on management and a lack of leadership."
(See Graham Rayman, Rikers Fight Club:  The
Knockout Punch, VILLAGE VOICE, April 15, 2009).

4

(2)   In February 2008, RNDC Correction Officer Lloyd
      Nicholson was arrested and subsequently indicted
      on charges that "he had ordered six inmates to
      beat two others in 2007 as part of a rogue
      disciplinary system that he and other guards
      called 'The Program.'"  On August 6, 2010, a
      Bronx County Supreme Court Judge sentenced Mr.
      Nicholson to six years in prison and five years
      of post-release probation, noting at that time
      that he had found Mr. Nicholson's testimony
      "'unbelievable and contrived.'"  (See Isolde
      Raftery, 6-Year Sentence for Guard in Rikers
      Island Beatings, N.Y. TIMES, August 7, 2010).

(3)   On October 17, 2008, RNDC inmate Christopher
      Robinson was beaten to death by three other
      inmates, allegedly with the facilitation of RNDC
      staff.  Mr. Robinson was murdered in his cell and
      "there are only two ways in which Robinson's
      attackers could have entered his cell without his
      consent:  Either the guards opened the door on
      purpose, or they left it open long after it
      should have been closed.  The location of guards
      during the assault remains unclear."  Following
      the assault and prior to his death, Mr. Robinson
      was denied medical treatment for as long as
      twelve hours.  (See Graham Raman, Teen Murder at
      Rikers Jail, VILLAGE VOICE, Nov. 19, 2008.)

(4)   In January 2009, three RNDC correction officers
      were indicted by the Bronx County District
      Attorney's Office.  The officers were alleged to
      have "recruited inmates over three months [in
      2008] to serve as 'managers, foot soldiers and
      enforcers' to maintain order [at RNDC].  The
      guards were also accused of training the inmates
      in how to restrain and assault their victims and
      deciding where and when attacks would occur."
      Two of the officers, Michael McKie and Khalid
      Nelson, are accused by prosecutors of having
      "[run] [RNDC] like an organized crime family" and
      face 25 years in prison on enterprise corruption

5

charges.  The third officer, Denise Albright, has
been charged with, inter alia, assault and
conspiracy.  Just one month prior to Robinson's
murder, an 18-year-old inmate named Alicedes
Polance suffered a broken eye socket in a beating
by a "team" of inmates [at RDNC] while [McKie,
Nelson and Albright] were on duty, records show.
In the aftermath, however, DOC officials failed
to uncover the alleged scheme in time to prevent
the fatal Robinson assault.  (See Benjamin
Weiser, Lawsuits Suggest Pattern of Rikers Guards
Looking Other Way, N.Y. TIMES, Feb. 4, 2009.)

The instant motion was heard on February 2, 2011.


**The 12(b)(6) Standard**


In assessing a Rule 12(b)(6) motion, the court must
assume the truth of the well-pled factual allegations of the
Complaint and must draw all reasonable inferences against the
movant.  See, e.g., Achtman v. Kirby, McInerney & Squire, LLP,
464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d
888, 891 (2d Cir. 1996).


The traditional test on a Rule 12(b)(6) motion
required that the Complaint not be dismissed unless "'it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim which would entitle him to relief.'"

6

Still, 101 F.3d at 891 (quoting Conley v. Gibson, 355 U.S. 41,

45-46 (1957)).  The Supreme Court has revisited the test,

however, and a Complaint is now subject to dismissal unless its

factual allegations, if credited, make the claim "plausible."

See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 556, 570 (2007).  Under this

test, the court must look first to the well-pled factual

allegations to determine whether they are plausible, and then

determine whether those plausible allegations, if proven,

suffice to establish liability.  See, e.g., Iqbal, 129 S. Ct. at

1949-50.  Twombly does not impose "a universal standard of

heightened fact pleading, but . . . instead require[s] a

flexible 'plausibility standard,' which obliges a pleader to

amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim

plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.

2007), rev'd on other grounds sub. nom. Ashcroft v. Iqbal, 129

S. Ct. 1937 (2009) (emphasis omitted).  In short, the pleading

must "'raise a right to relief above the speculative level.'"

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d

Cir. 2007) (quoting Twombly, 550 U.S. at 555).

7

In deciding a motion to dismiss, a court should consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Trans. Local 504, 992 F.2d 12, 15 (2d Cir. 1993). Additionally, "a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." Vasquez v. City of New York, 99 Civ. 4606, 2000 U.S. Dist. LEXIS 8887, at *2 n.1 (S.D.N.Y. Jun. 28, 2000) (citations omitted). See also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.").

**The Motion to Dismiss the § 1983 Claims Against**
**the Supervisory Defendants is Granted**

Plaintiff does not allege that any of the Supervisory Defendants were involved in the September 8, 2010 incident underlying the Complaint.  Therefore the only basis for Plaintiff's § 1983 claims against these defendants is his allegation that they "knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on plaintiff[,]" but failed to "take measures curb this pattern..." resulting in an "acquiescence in the known unlawful behavior of their subordinates."  Complt. ¶ 64.

The City and the Supervisory Defendants seek dismissal on the basis of the Supreme Court's ruling in Ashcroft v. Iqbal, 129 S. Ct. at 1949, wherein the Court held that a claim premised on a supervisor's "knowledge and acquiescence" in subordinates' wrongdoing is insufficiently stated.  Id.  The plaintiff/respondent in Iqbal brought a civil rights action against several high-ranking federal officials, including John Ashcroft (the former Attorney General of the United States) and Robert Mueller (the Director of the Federal Bureau of Investigation (FBI)), alleging that after the September 11 attacks, the FBI "arrested and detained thousands of Arab and

Muslim men" substantially on the basis of their race, religion,
or national origin, and that as a result the plaintiff was
unlawfully confined and subjected to harsh treatment.  129 S.
Ct. at 1951.  The plaintiff there argued that "under a theory of
"supervisory liability," the Attorney General and FBI Director
could be held liable for their "knowledge and acquiescence in
their subordinates' use of discriminatory criteria to make
classification decisions among detainees." Id. at 1949.  The
Supreme Court dismissed this argument, holding that "[a]bsent
vicarious liability, each Government official, his or her title
notwithstanding, is only liable for his or her own misconduct."
Id.  The Court went on to hold that for plaintiff to "prevail on
that theory, the complaint must contain facts plausibly showing
that petitioners purposefully adopted a policy of classifying
post-September-11 detainees as 'of high interest' because of
their race, religion, or national origin." Id. at 1952.  Having
failed in this respect, the Supreme Court held that the
complaint failed to state a claim for intentional discrimination
with respect to the Attorney General or the FBI Director.

          Prior to Iqbal, the controlling authority on
supervisory liability was Colon v. Coughlin, 58 F.3d 865, 873

(2d Cir. 1995), which held that liability "may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Id. (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Following Iqbal, courts in this district have held that a defendant cannot be held liable under section 1983 unless that defendant took an action that deprived the plaintiff of his or her constitutional rights. See, e.g., Joseph v. Fischer, 2009 U.S. Dist. LEXIS 96952, at *42-43 (S.D.N.Y. Oct. 7, 2009) ("[p]laintiff's claim, based on [a supervisor's] failure to take corrective measures, is precisely the type of claim Iqbal eliminated."); Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009

11

U.S. Dist. LEXIS 54141, at *27-28 (S.D.N.Y. Jun. 26, 2009)
(holding that Iqbal eliminated supervisory liability previously
permitted by Colon in situations where the supervisor "knew of
and acquiesced to a constitutional violation committed by a
subordinate"); Newton v. City of New York, 640 F. Supp. 2d 426,
448 (S.D.N.Y. 2009) ("passive failure to train claims pursuant
to § 1983 have not survived the Supreme Court's recent decision
in [Iqbal]").

        The claims in Iqbal involved, inter alia, denial of
equal protection and discrimination, which require proof of
discriminatory intent.  Iqbal, 129 S. Ct. at 1948 (citation
omitted).  In that context, with intention-based constitutional
claims in mind, the Supreme Court held that a supervisor's "mere
knowledge of his subordinate's discriminatory purpose" does not
amount to the supervisor's violating the constitution.  Id. at
1949.  However, "the factors necessary to establish a Bivens
violation will vary with the constitutional provision at issue."
Id. at 1948.

        Here, the underlying constitutional right of the
inmate is to be free from the use of excessive force by his

12

jailers.  In such a case, I conclude that the traditional Colon
categories of supervisory liability still apply.  See Jackson v.
Goord, 664 F. Supp. 2d 307, 324 & n.7 (S.D.N.Y. 2009) (holding
Colon standard is unaffected by Iqbal in deliberate indifference
case, because Iqbal "involved discriminatory intent.").
Following Iqbal, other judges in the Second Circuit have
continued to cite all five of the Colon categories as the bases
for establishing supervisory liability in cases alleging
violations of a plaintiff's Fourth and Eighth Amendment rights.
See, e.g., Id.; Gordon v. City of New York, 09 Civ. 3908, 2009
WL 3878241, at *2 (E.D.N.Y. Nov. 18, 2009); Dowdy v. Hercules,
07 Civ. 2488, 2010 WL 169624, at *6 (E.D.N.Y. Jan. 15, 2010);
Garcia v. Watts, 08 Civ. 7778, 2009 WL 2777085, at *12 (S.D.N.Y.
Sept. 1, 2009); Swain v. Doe, 04 Civ. 1020, 2009 WL 3151183, at
*5 (D. Conn. Sept. 24, 2009).


        Bellamy, 2009 U.S. Dist. LEXIS 54141, at *27-28,
Joseph, 2009 U.S. Dist. LEXIS 96952, at *42-43, and Newton, 640
F. Supp. 2d at 448, cited by the city and the Supervisory
Defendants, did not focus on the specific role that
discriminatory intent played in Iqbal.  Subsequent decisions
have noted that Bellamy, Joseph, Newton, and similar rulings

13

"may overstate Iqbal's impact on supervisory liability" and held that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply." See Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010); Qasem v. Toro, 737 F. Supp. 2d 147, 151 (S.D.N.Y. 2010) (declining to adopt the "narrow interpretation of Iqbal" advanced by Bellamy, Joseph and Newton).

In this action Colon remains the standard for establishing personal involvement by supervisory officials under 42 U.S.C. § 1983.

Here, the Complaint attempts to state a claim under the third Colon category; each of the supervisors is alleged to have received extensive information concerning the City's pattern of incidents involving unnecessary and excessive force to inmates and the failure of the DOC to prohibit its staff from using such force, and the Supervisory Defendants are alleged to

14

have failed to take any steps to curb those unconstitutional
abuses.  Complt. ¶¶ 11-15.  They are alleged to have allowed the
continuation of a policy or custom under which the
unconstitutional practice of using excessive force against
inmates incarcerated in the City's jails has occurred.  See,
e.g., Jean-Lauren v. Wilkerson, 438 F. Supp. 2d 318, 326
(S.D.N.Y. 2006) (denying motion to dismiss, holding that
complaint's allegation that Commissioner Martin Horn authorized
correction officers to maintain a custom or practice that
authorized the use of physical force against inmates "clearly
falls into the third Colon category").

        However, Plaintiff's allegations of the existence of a
policy or custom are conclusory and do not reach the requisite
level of plausibility to survive under Twombly and Iqbal.  See
Iqbal, 129 S.Ct. at 1937 (citing Twombly, 550 U.S. at 570).  In
the Complaint, Plaintiff points to two cases of violence that
occurred several years prior to the alleged violence against him
and the existence of reports from unspecified time periods which
would have reported violence at New York City detention
facilities.  Complt. ¶¶ 19-22.  He conclusorily alleges that
these prior incidents established a policy or custom of violence

15

against prisoners, and that the Supervisory Defendants were
aware of and allowed this policy to continue.  Complt. ¶¶ 13-26.
Given the passage of time and the installation of a new DOC
Commissioner and other supervisory staff between the prior
violent incidents and the alleged abuse of Plaintiff, as well as
the general failure of Plaintiff to plausibly allege that a
policy or custom underlay these acts of violence, Plaintiff has
not sufficiently alleged that the violence which harmed him was
part of a larger policy or custom at the DOC.[1]  See, e.g., Burton
v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (holding
that, in the First Amendment retaliation context, "[t]here is no
bright line to define the outer limits beyond which a temporal
relationship is too attenuated to establish a causal
relationship, so courts judge the permissible inferences that
can be drawn from temporal proximity in the context of
particular cases." (quoting Gorman-Bakos v. Cornell Coop.
Extension, 252 F.3d 545, 554 (2d Cir.2001); Espinal v. Goord,
558 F.3d 119, 129 (2d Cir.2009)) (internal quotations omitted);

---

[1] Plaintiff's submission of newspaper articles about the "Program" at New York
City Detention Facilities, through which inmates committed acts of violence
against each other at the behest of prison staff, does not affect this
holding.  Plaintiff does not allege that the abuse he was subjected to was
related to the "Program."

Carson v. Lewis, 35 F. Supp. 2d 250, 269 (E.D.N.Y. 1999) (in summary judgment context, denying admissibility of a 1989 report because "the passage of time between the issuance of the SIC [State Investigation Committee] Report and the events in question sufficiently attenuates its trustworthiness and renders it inadmissible"); compare Gentile v. County of Suffolk, 129 F.R.D. 435 (E.D.N.Y. 1990), aff'd, 926 F.2d 142 (2d Cir. 1991) (admitting same SIC Report when issued on eve of trial).

Plaintiff has therefore failed to state a claim under Colon against the Supervisory Defendants.

**The Motion to Dismiss the State Law Claims Against the Supervisory Defendants is Denied**

According to the Supervisory Defendants, New York law bars lawsuits against prison employees in their personal capacity for damages arising out of "any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." N.Y. Correct. Law § 24 (McKinney's 2010). See Baker v. Coughlin, 77 F.3d 12, 14-15 (2d Cir. 1996) (holding that even though § 24

17

only refers to actions in state court, it applies to state
claims brought in federal court).  The Supervisory Defendants
also contend that the Eleventh Amendment to the U.S.
Constitution bars Plaintiff from suing officials under New York
law in their official capacities.

The Plaintiff alleges, pursuant to New York State law,
claims of (1) Assault and Battery; (2) False Imprisonment; (3)
Intentional Infliction of Emotional Distress; (4) Negligent
Infliction of Emotional Distress; and (5) Negligent Hiring,
Training and Retention of Employment Services.

"It is well settled that Section 24 shields employees
of a state correctional facility from being called upon to
personally answer a state law claim for damages based on
activities that fall within the scope of the statute." Ierardi
v. Sisco, 119 F.3d 183, 186 (2d Cir. 1997) (emphasis added); see
also Joy v. New York, 09 Civ. 841, 2010 WL 3909694, *4 (N.D.N.Y.
Sept. 30, 2010).  However, by its text, Section 24 does not
apply to the City's correctional employees.  See Martinez v.
Robinson, 99 Civ. 11911, 2001 WL 498407, *4 (S.D.N.Y. May 10,
2001) ("Thus, the text of Section 24, especially when read

together with other relevant statutes, indicates that it does
not shield employees of the New York City Department of
Correction from liability."). See also Ismail v. Singh, 776
N.Y.S.2d 166, 169 (N.Y.Sup. 2003) ("The legitimate purpose of
Corrections Law § 24 is to preserve order and safety within New
York State penal facilities.")

In addition, Plaintiff's state law claims assert
liability against the City of New York for the tortious conduct
of the individual Defendants on a respondeat superior basis.
Complt. ¶¶ 73, 78, 83, 88, 91-95. Section 24 does not impact
suits against the Defendants' employer, the City of New York,
for their conduct. See N.Y. Correct. Law § 24.

Furthermore, "[w]hile states are protected by the
Eleventh Amendment from suits brought by a private party,
municipalities are not." Sorrentino v. Outhouse, 03 Civ. 104,
2006 WL 2052307, *8 (N.D.N.Y. Jul. 21, 2006) (citing Will v.
Mich. Dep't of State Police, 491 U.S. 58, 70 (1989)).

Defendants seek dismissal of Plaintiff's claim against
the City for its negligent hiring, training and retention of the

19

individual Defendants on the grounds that such a claim is barred
where the challenged action occurred within the scope of
employment.  Plaintiff concedes that the City cannot be liable
for the negligent hiring, training and retention of the
Supervisory Defendants if the City agrees that the individual
defendant's actions were undertaken in the scope of their
employment.  See Kramer v. City of New York, 04 Civ. 106, 2004
WL 2429811, *12 (S.D.N.Y. Nov. 1, 2004).


        Pursuant to New York General Municipal Law § 50-k, a
determination by the New York City Corporation Counsel as to
whether an employee was acting within the scope of his or her
employment occurs only after the employee delivers the complaint
to the New York City Law Department.  See N.Y. Gen. Mun. Law §
50-k(2) (McKinney's 2010).  As Plaintiff has not served Officer
Perez or identified the John Does, the New York City Corporation
Counsel has not yet made his determination.  An issue of fact
"appropriate for a jury" thus may be presented.  Rowley v. City
of New York, 00 Civ. 1793, 2005 WL 2429514, *13 (S.D.N.Y. Sept.
30, 2005); see also Spitz v. Coughlin, 557 N.Y.S.2d 647, 648
(N.Y.App.Div. 1990) (finding intentional misconduct by
correction officer to be outside scope of employment).

Accordingly, Plaintiff's claim against Defendant City for negligent hiring, training and retention is not dismissed.

## The Motion to Dismiss the Monell Claim is Granted

To prevail on a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must show that a municipal policy or custom caused the deprivation of his constitutional rights. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690-91 (1978).  A municipality may not be held liable under § 1983 on the basis of respondeat superior.  Monell, 436 U.S. at 694.  Rather, "[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries....  Second, the plaintiff must establish a casual connection – an 'affirmative link' - between the policy and deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985), cert. denied, 480 U.S. 916 (1987) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 & n.8, 828 (1985)).  Therefore, in order to establish municipal liability, plaintiff must establish that an identified municipal policy or practice was the "moving force [behind] the constitutional violation."

21

Monell, 436 U.S. at 694.  See also Anderson v. City of New York,
657 F. Supp. 1571, 1575-76 (S.D.N.Y. 1987) (A plaintiff also
"must link the behavior in question to the policy of failure to
discipline - for example, the officer must have known of the
policy at the time he allegedly committed the civil rights
violations."); see also Batista v. Rodriguez, 702 F.2d 393, 398
(2d Cir. 1983) ("The Fourth Count... does not claim that the
alleged unlawful arrests and assault of November 8, 1976, were
the product of the City's alleged policy and practice or that
the policy was even a substantial factor leading to those
injuries....") (citation omitted).

        As to the issue of what a complaint must allege to
survive a motion to dismiss, the Second Circuit has held that
"'the mere assertion... that a municipality has such a custom or
policy is insufficient in the absence of allegations of fact
tending to support, at least circumstantially, such an
inference." Dwares v. City of New York, 985 F.2d 94, 100 (2d
Cir. 1993).  However, in Leatherman v. Tarrant County Narcotics
Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993), the
Supreme Court "held that a federal court may not apply a
'heightened pleading standard' in civil rights cases alleging

22

municipal liability under section 1983." Rheingold v. Harrison

Town Police Dept., 568 F. Supp. 2d 384, 394 (S.D.N.Y. 2008)

(citing Leatherman, 507 U.S. at 168). Following Iqbal and

Twombly, Monell claims must satisfy the plausibility standard:

> It is questionable whether the boilerplate Monell
> claim often included in many § 1983 cases, including
> this one, was ever sufficient to state a claim upon
> which relief could be granted. See Smith v. City of
> New York, 290 F. Supp. 2d 317, 322 (E.D.N.Y. 2003)
> (holding that a conclusory, boilerplate assertion of a
> municipal policy or custom was insufficient to survive
> motion to dismiss). In light of Ashcroft v. Iqbal, --
> U.S. --, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009), and
> Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127
> S.Ct. 1955, 167 L. Ed. 2d 929 (2007), it is now clear
> that such boilerplate claims do not rise to the level
> of plausibility.

Santiago v. City of New York, 09 Civ. 856, 2009 U.S. Dist. LEXIS

75372, at *7 (E.D.N.Y. Aug. 18, 2009) (dismissing Monell claim).

See also In re Dayton, 02 Civ. 2381, 2011 WL 2020240, at *11

(S.D.N.Y. Mar. 31, 2011) (dismissing Monell claim where factual

assertions in complaint were "too conclusory" and constituted a

"boilerplate recitation of the elements of a Monell claim");

Abreu v. City of New York, 657 F. Supp. 2d 357, 360-61 (E.D.N.Y.

2009) ("[The plaintiff's] complaint succinctly states one of the

core legal concepts animating Monell liability. But it does

absolutely nothing else"); Brodeur v. City of New York, 99 Civ.

23

661, 2002 U.S. Dist. LEXIS 4500, at *7 (S.D.N.Y. Mar. 18, 2002)

(court dismissing complaint against City where complaint "flatly

asserts a policy but contains no factual allegations sufficient

to establish a municipal policy or custom"); George v. Burton,

00 Civ. 143, 2001 U.S. Dist. LEXIS 24, at *5-6 (S.D.N.Y. Jan. 4,

2001) (court dismissing complaint with prejudice where plaintiff

"failed to proffer any facts in his complaint from which we can

infer such a pattern or practice").

Here, the complaint lacks sufficient factual details

concerning Monell liability and contains boilerplate allegations

of unconstitutional policies and practices. See Complt. ¶¶ 67-

68. Specifically, Plaintiff conclusorily alleges that the City

"permitted, tolerated and was deliberately indifferent to a

pattern and practice of staff brutality and retaliation by DOC

staff at the time of plaintiff's beatings [which] constituted a

municipal policy, practice or custom and led to plaintiff's

assault." Complt. ¶ 67.

Plaintiff asserts in his opposition brief that "[f]ar

from mere boilerplate, Plaintiff's Complaint outlines with

specificity the factual basis for his constitutional

24

deprivations and injury (¶¶ 19-57), the official policy or
custom they resulted from (¶¶ 10-15) and a 'causal link' between
them (¶¶ 67-69)."  Defendants dispute this assertion, except
with respect to Plaintiff's allegations concerning how the
incident unfolded (Complt. ¶¶ 27-57).

As discussed above in reference to Plaintiff's claims
under Colon, the prior violent incidents relied upon by
Plaintiff are too attenuated and isolated from his own injury to
plausibly establish (a) a policy or custom of violence against
prisoners, and (b) that his injury was linked to that policy or
custom.  Plaintiff relies on conclusory allegations to fill the
gaps in his complaint, rendering his Monell allegations
insufficient under Iqbal and Twombly.

Furthermore, it is well established that a single
incident does not give rise to an unlawful practice by
subordinate officials "so permanent and well-settled as to
constitute 'custom or usage.'"  City of St. Louis v. Prapotnik,
485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress &
Co., 398 U.S. 144, 167-168 (1970));  see also Sorlucco v. New
York City Police Department, 971 F.2d 864, 870 (2d Cir. 1992)

25

(municipality may not be held liable under Section 1983 for isolated unconstitutional acts of its employees) (citing Monell, 436 U.S. at 694); Anderson, 657 F. Supp. at 1574 ("plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Therefore, Plaintiff's Monell claim is dismissed.

**Conclusion**

For the foregoing reasons, the Supervisory Defendants' motion to dismiss is granted in part and denied in part. Plaintiff is granted leave to file an amended complaint within 60 days of this order.

It is so ordered.

New York, NY
May 3₀ , 2011

ROBERT W. SWEET
U.S.D.J.

26